CALABRESI, Circuit Judge,
dissenting:
I agree with the majority opinion in its description of the facts and history of this case, its statements of the controlling law in Parts I and II, and its ruling that Wrobel failed to raise questions of material fact warranting a trial on his First Amendment speech claim. I respectfully dissent, however, because I believe that Wrobel has adduced sufficient evidence to permit a trial on his First Amendment political association claim.
Undoubtedly, newly elected administrations are permitted to pursue reform. Such reform might well include ridding a public agency of underperforming employees hired by preceding administrations. And there is certainly evidence in the record that supports the defendants’ claims that Wrobel and other employees hired by the preceding administrations were disobedient and inefficient. Even if these claims were shown to be true, however, the record is also rife with allegations of the defendants harassing their employees or otherwise treating them uncivilly. The tactics allegedly adopted by the defendants remind us that “reform” may carry its own abuses. But such abuses, as the majority rightly emphasizes, do not without more amount to a federal claim. Specifically, for a First Amendment political association claim to be valid, there must be evidence that the abuses were politically motivated;
Unlike the majority, I believe that the record before us contains evidence that would permit a jury to conclude that an impermissible political agenda motivated the defendants’ treatment of Wrobel. Considered on their own and without some indication of a political context, Naylon’s many references to replacing “old regimes”. with “new regimes” and forming “new teams” do not carry political valence. These terms could simply serve, in Naylon’s manner of talking, to draw non-political lines between previously hired workers and Giambra’s newer, and assertedly more effective, employees. In this I agree with the majority. Nevertheless, there is one statement in the record — acknowledged, but I think undervalued, by the majority— that I think would allow a jury to read political valences into all those otherwise neutral references.
Timothy Elliott stated in his affidavit of May 24, 2010: “At one point during one of the initial conversations I had with Naylon, he- told me that, ‘we know you guys are all democrats, hired by the other administration’ .... ” As I read the record, a jury could find that Naylon’s remark about “democrats” was made in the same time frame as his other statements regarding “regimes” and “teams.” And, if it did so find, a jury could conclude that, for Naylon, the “old regime” was equivalent to “democrats,” i.e., Naylon’s political antagonists. A jury could then reasonably also find that Naylon’s campaign to “get rid of [the] old regime” constituted a politically motivated purge.
Of course, Wrobel had declared himself a Republican during an early meeting with Naylon. But Wrobel has • also alleged that — notwithstanding this early declaration — Naylon later accused' him of being part of the “old regime” and “in the same boat” as Elliott and other pre-Giambra hires. In light of Wrobel’s allegations and Elliott’s testimony, it would be entirely plausible for a jury to conclude (a) that Naylon considered Wrobel part of a faction politically opposed to Giambra, and (b) that Naylon took adverse actions against him for this reason.
*34 The facts of this case render our disposition a close call. But, all things considered, I would let a jury decide the validity of Wrobel’s political association claim. For that reason, I respectfully DISSENT.